**POMERANTZ  LLP**
Marc I. Gross
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: migross@pomlaw.com
         mjwernke@pomlaw.com
***Lead Counsel for Lead Plaintiff and the Class***

**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
KEVIN RUF (#136901)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
***Liaison Counsel for Lead Plaintiff***

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD TODD, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>     vs.<br><br>STAAR   SURGICAL   COMPANY, BARRY G. CALDWELL, and JOHN SANTOS<br><br>                    Defendants. | Case No: 2:14-CV-05263-MWF-GJS<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom:  5A<br>Date: October 16, 2017<br>Time: 11:30 a.m. |

Plaintiff's Motion For Final Approval 2:14-CV-05263-MWF-GJS

## NOTICE OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

PLEASE TAKE NOTICE that at 11:30 a.m. on October 16, 2017, or as soon thereafter as counsel may be heard, before the Honorable Michael W. Fitzgerald, in the United States District  Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Lead Plaintiff and Class Representative Edward Todd ("Lead Plaintiff" or "Plaintiff") will move for final approval of the Settlement for  $7,000,000 and approval of the proposed plan of allocation of the proceeds of the Net Settlement Fund (the "Plan of Allocation"), as set forth in the Stipulation, between the parties.

 This motion is supported by the accompanying Memorandum of Points and Authorities in Support; the Declaration of Michael J. Wernke in Support of Lead Plaintiff's Motion for Final Approval of the Proposed Class Action Settlement and Plan of Allocation, and Motion for Approval of Attorneys' Fees and Expenses ("Wernke Declaration"); and the exhibits filed therewith.

Class Counsel is unaware of any opposition to this Motion. Pursuant to the Preliminary Approval Order, any objection to any aspect of the Settlement or the Plan of Allocation must be filed on or before September 25, 2017. To date, no objections have been filed.

i

## **STATEMENT OF ISSUES TO BE DECIDED**

1.     Whether the preliminarily approved Settlement for $7,000,000 be finally approved;

2.     Whether the proposed Settlement, on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate to the Settlement Class and should be approved by the Court;

3.     Whether the Plan of Allocation is fair, reasonable, and adequate;

4.     Whether the notice satisfies due process and is in compliance with Fed. R. Civ. P. 23(e);

5.     Whether the Judgment should be entered herein; and

6.     To rule upon such other matters as the Court may deem appropriate.

# **TABLE OF CONTENTS**

I.      OVERVIEW OF THE LITIGATION ...................................................1

    A.      Filing of the Amended Complaints, Defendants' Motion to
        Dismiss, Motion to Strike and Motion to Disqualify ........................1

    B.      Lead Plaintiff's Motion For Class Certification ................................4

    C.      Discovery ..........................................................................................4

        1.      Discovery From Defendants ...................................................5

        2.      Discovery From Lead Plaintiff ...............................................6

    D.      Settlement Negotiations ....................................................................6

    E.      Preliminary Approval and Notice .....................................................7

II.     THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT
      AS FAIR, REASONABLE, AND ADEQUATE..........................................7

    A.      Standard ............................................................................................7

    B.      The Settlement Is The Result Of Arm's-Length Negotiations And
        A Mediator's Recommendation.........................................................9

    C.      All of the Relevant Factors Employed by Courts in This
        Circuit Favor Approval of the Proposed Settlement As
        Fair, Reasonable and Adequate........................................................10

        1.      Lead Plaintiff's Case is Strong, But Entails Risks ................10

        2.      The Expense, Complexity, And Likely Duration Of
            Further Litigation.................................................................14

iii

3.    The Risk Of Maintaining Class Action Status Throughout The Trial ................................................................. 15

4.    The Amount Offered in the Settlement ................................... 16

5.    Extent Of Discovery Completed And The Stage of the Proceedings ......................................................... 18

6.    Experienced Counsel Concur that the Settlement, Which was Negotiated in Good Faith and at Arm's-Length, is Fair, Reasonable, and Adequate ............................................. 19

7.    The Reaction of the Class Members to the Settlement ........... 21

D.    The Notice Program Satisfied Due Process And Complied With Fed. R. Civ. P. 23(e) ......................................................... 22

1.    The Dissemination Plan Satisfies Due Process ..................... 22

2.    The Contents of the Notice Satisfy Due Process .................... 23

III.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION ........ 24

IV.   CONCLUSION ................................................................. 25

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aarons v. BMW of N. Am., LLC*,
  2014 WL 4090564 (C.D. Cal. Apr. 29, 2014).....................................................13

*Boyd v. Bank of Am. Corp.*,
  2014 WL 6473804 (C.D. Cal. Nov. 18, 2014)....................................................20

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014).......................................................10

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992)..................................................................8, 24

*Edward Todd v. STAAR Surgical Company, et al.*,
  No. 2:14-cv-05263 . ECF No. 1 .............................................................*passim*

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ......................................................................................22

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N.D. Cal. 1980), *aff'd,* 661 F.2d 939 (9th Cir. 1981) ...............19

*Franks v. Kroger Co.*,
  649 F.2d 1216 (6th Cir. 1981).........................................................................22

*Glass v. UBS Fin. Servs., Inc.*,
  2007 WL 221862 (N.D. Cal. Jan. 26, 2007),
  *aff'd*, 331 Fed. Appx. 452 (9th Cir. 2009)........................................................19

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)...........................................................8, 16, 22

*In re Am. Apparel, Inc. S'holder Litig.*,
   2014 WL 10212865 (C.D. Cal. July 28, 2014) ..................................................13

*In re Am. Bank Note Holographics, Inc.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) ..............................................................12

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d. Cir. 2001) ...........................................................................17

*In re Critical Path, Inc. Sec. Litig.*,
   2002 WL 32627559 (N.D. Cal. June 18, 2002) ................................................19

*In re Datatec Sys., Inc. Sec. Litig.*,
   2007 WL 4225828 (D.N.J. Nov. 28, 2007) .......................................................24

*In re Gen. Instrument Sec. Litig.*,
   209 F. Supp. 2d 423 (E.D. Pa. 2001) ................................................................24

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................24

*In re Heritage Bond Litig.*,
   2005 WL 1594403 (C.D. Cal. June 10, 2005)...............................10, 14, 20, 24

*In re Immune Response Sec. Litig.*,
   497 F.Supp.2d 1166 (S.D. Cal. 2007) ..............................................................12

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) .........................................................8, 16, 18, 19

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................15, 17, 24

*In re Pfizer Inc. Sec. Litig.*,
   2014 WL 3291230 (S.D.N.Y. July 8, 2014) .....................................................13

*In re Rambus Inc. Derivative Litig.*,
   2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ..............................................18, 21

vii

*In re Warner Comm. Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) ...................................................13

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) ..............................................8, 10

*Linney v. Cellular Alaska P'ship*,
   1997 WL 450064 (N.D. Cal. July 18, 1997) ......................................8

*Lundell v. Dell, Inc.*,
   2006 WL 3507938 (N.D. Cal. Dec. 5, 2006) ......................................9

*Marshall v. Holiday Magic, Inc.*,
   550 F.2d 1173 (9th Cir. 1977) ..............................................22, 23

*Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ...................................................14

*Nobles v. MBNA Corp.*,
   2009 WL 1854965 (N.D. Cal. June 29, 2009) .................................14

*Officers for Justice v. Civil Serv. Comm'n.*,
   688 F.2d 615 (9th Cir. 1982) ...................................................8, 16

*Roberti v. OSI Sys., Inc.*,
   2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) ................................8, 19

*Satchell v. Fed. Express Corp.*,
   2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ....................................9

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) .................................................14, 22

*Vasquez v. Coast Valley Roofing, Inc.*,
   266 F.R.D. 482 (E.D. Cal. 2010)...................................................15

*Vinh Nguyen v. Radient Pharm.*,
   2014 WL 1802293 (C.D. Cal. May 6, 2014).................................12

viii

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

ix

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiff and Class Representative Edward Todd ("Lead Plaintiff" or "Plaintiff"), through his undersigned counsel ("Class Counsel"), submit this memorandum of points and authorities in support of their motion, pursuant to Federal Rule of Civil Procedure 23(e) for final approval of the class action Settlement, as set forth in the Stipulation and Agreement of Settlement, dated June 20, 2017 (the "Settlement Stipulation"). This Action has been settled for a $7 million cash payment. The Settlement will inure to the benefit of investors in STAAR Surgical Company ("STAAR" or the "Company). The Defendants are STAAR, Barry Caldwell ("Caldwell") and John Santos ("Santos") (collectively, the "Defendants"). The Settlement results from Lead Plaintiff's vigorous case prosecution and arm's-length settlement negotiations between the Parties.

## I.   OVERVIEW OF THE LITIGATION[1]

On July 8, 2014, Todd filed a putative class action complaint styled as *Edward Todd v. STAAR Surgical Company, et al.*, No. 2:14-cv-05263 (MWF) (the "Action").   ECF No. 1. On September 8, 2014, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Todd moved for appointment as lead plaintiff and approval of Pomerantz LLP ("Pomerantz") as lead counsel and Glancy Prongay & Murray LLP ("GP&M") as liaison counsel. ECF No. 7.  On September 29, 2014, the Court granted the motion. ECF No. 22.

### A.   Filing of the Amended Complaints, Defendants' Motion to Dismiss, Motion to Strike and Motion to Disqualify

On October 20, 2014, Lead Plaintiff filed the Amended Complaint, alleging violations of §10(b) of the Exchange Act against STAAR, Caldwell and

---

[1] Unless otherwise defined, capitalized terms herein have the same meanings attributed to them in the Stipulation. ECF No. 170-2.

1

Santos, and alleging violations of § 20(a) of the Exchange Act against Caldwell and Santos.  ECF No. 25. The Amended Complaint expanded on the allegations contained in the previous complaint, incorporating the results of Lead Plaintiff's ongoing investigation into the claims.  The Amended Complaint adjusted the class period to November 1, 2013 through June 30, 2014, inclusive.

Pursuant to various motions made by STAAR asserting that information identified in the Amended Complaint from Confidential Witness #1 ("CW1") was protected by the attorney-client privilege, the Court issued orders on October 24, 2014, and November 21, 2014 temporarily sealing the Amended Complaint pending a privilege determination.  ECF Nos. 31, 39. On March 20, 2015, Lead Plaintiff and STAAR took the deposition of CW1 in the presence of the Court. Wernke Decl. ¶ 19. On April 20, 2015, STAAR filed a motion to strike privileged information from the Amended Complaint, which was thereafter fully briefed. *See* ECF Nos. 55, 69, 74. On June 8, 2015, the Court heard oral argument on STAAR's motion to strike, and on August 21, 2015, the Court issued an order granting STAAR's motion. No. 84.

On August 28, 2015, Lead Plaintiff filed the operative Corrected Second Amended Complaint ("SAC"), which removed information that the Court ordered be stricken.  ECF No. 89. The SAC alleges misrepresentations and omissions by Defendants during the Class Period concerning the Company's compliance with FDA regulations and the likelihood of the Company's new product to receive FDA approval. The SAC alleges that investors were harmed when the market learned of Defendants' scheme through the FDA's publication of a Warning Letter, causing the share price of STAAR's common stock to fall, thereby damaging investors. Wernke Decl. ¶ 20.

On September 21, 2015, Defendants filed a motion to dismiss the SAC (ECF No. 96) along with a request for judicial notice. ECF No. 97. Defendants' motion raised numerous complicated issues relating to Lead Plaintiff's claims. In addition to their complexity, Defendants' motion papers were voluminous. The motion was accompanied by a 25 page memorandum of law and 21 exhibits consisting of approximately 1020 pages. Wernke Decl. ¶ 23.

On September 30, 2015, Defendants filed a motion to disqualify Plaintiff's Counsel for its exposure to STAAR's privileged information through conversations with CW1. ECF No. 98.

On October 19, 2015, Plaintiff submitted a detailed opposition brief to Defendants' motion to dismiss. ECF No. 110. In his opposition, Plaintiff addressed each of the arguments that Defendants raised. Wernke Decl. ¶ 25.

On October 20, 2015, Plaintiff submitted a detailed opposition brief to Defendants' motion to disqualify Plaintiff's Counsel. ECF No. 112.

On November 2, 2015, Defendants filed their reply briefs in support of their motion to dismiss and motion to disqualify. ECF Nos. 118, 121.

On November 16, 2015, the Court heard oral argument on Defendants' motions. Defendants' filed notice of supplemental authority in support of their motion to dismiss on March 8, 2016 (ECF No. 130), and Lead Plaintiff filed a response on March 14, 2016. ECF No. 131. Lead Plaintiff filed notice of supplemental authority in support of his opposition to Defendants' motion to disqualify on April 4, 2016 (ECF No. 132), and Defendants filed a response on April 5, 2016. ECF No. 133.

On April 12, 2016, the Court denied Defendants' motion to dismiss the SAC and motion to disqualify Plaintiff's Counsel. ECF Nos. 134, 135. On May 2, 2016, Defendants filed their Answers to the SAC. ECF Nos. 146-148.

**B.    Lead Plaintiff's Motion For Class Certification**

On August 19, 2016, Lead Plaintiff moved the Court for an order (1) certifying the claims against Defendants as a class action; (2) appointing Lead Plaintiff as class representative and (3) appointing Pomerantz as Class Counsel. ECF No. 157. In the supporting memorandum, Lead Plaintiff argued that the Action was well-suited for class action treatment, and that all the requirements of Federal Rule of Civil Procedure 23 were satisfied. ECF No. 157.

Lead Plaintiff attached the expert report by Steven Feinstein, Ph.D.   ECF No. 158-1. Dr. Feinstein provided opinions on the complex securities-litigation-specific issues of market efficiency and damages.   Dr. Feinstein's 38-page opening report was based on an event studies he conducted, and was supported by 7 exhibits totaling an additional 40 pages.  ECF No. 232-1.

On October 25, 2016, Defendants filed their opposition to class certification, arguing (i) Lead Plaintiff's motion lacks evidentiary support; (ii) Todd cannot satisfy the typicality requirement because he is subject to unique defenses; and (iii) Lead Plaintiff cannot establish commonality or predominance under Rule 23 because he has not demonstrated market efficiency.  ECF No. 162.

On November 23, 2016, Lead Plaintiff filed his reply papers in further support of class certification, addressing each of Defendants arguments.  ECF No. 164. On December 12, 2016, the Court heard oral argument on Lead Plaintiff's motion for class certification. ECF No. 166. On January 5, 2017, the Court granted Lead Plaintiff's motion for class certification.

**C.    Discovery**

Upon denial of Defendants' motion to dismiss, the automatic stay of discovery pursuant to the PSLRA was lifted.  In the following weeks, the Parties spent considerable time negotiating a proposed pretrial schedule.  On May 2,

4

2016, the Parties filed with the Court a Rule 26(f) Joint Case Management Conference Statement, which included a proposed case schedule and discovery plan.  ECF No. 144.

On May 16, 2016 the Court held a scheduling conference, issuing an order regarding jury trial containing dates and deadlines for the Action. ECF No. 152. The Court set April 3, 2018 as the trial date.

### 1.    Discovery From Defendants

On July 21, 2016, Lead Plaintiff served his first set of document requests on Defendants, consisting of a total of 37 requests for production. Wernke Decl. ¶ 43. Defendants served their responses and objection on September 8, 2016. *Id.* ¶ 44. Plaintiff's Counsel engaged in extensive meet-and-confer conferences with Defendants' counsel as to the scope and manner of Defendants' document production. *Id.*  The parties came to an agreement on many issues. *Id.*

The Parties were unable to come to an agreement on the production of post-Class Period correspondence with the FDA. *Id.* ¶ 46. Per Magistrate Judge Standish's Procedures, on December 8, 2016, the Parties requested a pre-discovery motion telephonic conference for Lead Plaintiff's motion to compel production of the post-Class Period documents, submitting a summary of the discovery dispute and the Parties' respective positions via email. *Id.* On December 28, 2016, following a pre-discovery motion teleconference, Magistrate Judge Standish ordered Defendants to produce post-class period documents related to FDA inspections. ECF No. 167.

On February 7, 2017, Plaintiff served subpoenas for the production of documents on certain third-party investors in STAAR, pursuant to which documents were produced. Wernke Decl. ¶ 48. Plaintiff also served Defendants with Plaintiff's first set of interrogatories, to which Defendants responded on

March 14, 2017. *Id.* ¶ 49.  And on April 24, 2016, Lead Plaintiff noticed the depositions of ten current and former employees of STAAR. *Id.* ¶50.

Pursuant to Lead Plaintiff's documents requests, Defendants have produced 357,713 pages of documents. *Id.* ¶ 51.  Plaintiff's Counsel have devoted substantial time to reviewing and analyzing these documents and organizing them for depositions. *Id.*

### 2.    Discovery From Lead Plaintiff

On August 31, 2016, Defendants served one set of 30 document requests on Lead Plaintiff.  These requests sought, *inter alia*, all documents relating to any investments made in any STAAR securities, and that Lead Plaintiff reviewed in connection with their decision to purchase STAAR securities. Wernke Decl. ¶ 52.

Lead Plaintiff served responses and objections to the requests. *Id.* ¶ 53. The Parties participated in multiple meet-and-confer sessions regarding the scope of production and reached a compromise. *Id.*

On October 12, 2016, Defendants took the deposition of Lead Plaintiff, which Plaintiff's Counsel defended. *Id.* ¶ 54.

### D.    Settlement Negotiations

On January 24, 2017, following oral argument on Lead Plaintiff's motion for class certification, the Parties attended an in-person mediation overseen by Michelle Yoshida, Esq., a highly-regarded mediator with Phillips ADR, one of the nation's preeminent mediation firms. *Id.* ¶¶ 61-62. The mediation was attended by Plaintiff's Counsel, counsel for Defendants and certain of the Company's insurance carriers. *Id.*

Class Counsel prepared detailed mediation statements with a supporting record of 35 exhibits. *Id.* ¶63. In advance of the mediation session, the Parties exchanged and submitted their mediation statements and case-related materials to

Ms. Yoshida. *Id.* The Parties also exchanged and submitted reply briefs to Ms. Yoshida before the in-person settlement discussions. *Id.*

Over the course of the session, Ms. Yoshida engaged in extensive discussions with counsel and the carriers in an effort to find common ground between the Parties' respective positions. *Id.* ¶64. While the session was productive, it did not result in a resolution. *Id.*

The Parties continued their discussions with the mediator's assistance over the course of the next several months as discovery in the action continued. *Id.* ¶ 65. With the Parties at an impasse, on May 9, 2017, Ms. Yoshida proposed a Mediator's Recommendation, which the Parties accepted on May 10, 2017. *Id.* The Parties signed an MOU on May 12, 2017. *Id.*

### E.    Preliminary Approval and Notice

On July 11, 2017, the Court preliminarily approved the Settlement permitting the notice process to begin. To date, 8,759 Short-Form Notices have been sent by first-class mail to potential Class Members, and a Summary Notice has been timely published transmitted over the *Globe Newswire* and published in *Investor's Business Daily*. *See* GCG Decl., ¶¶ 7, 10. Copies of the Long Form Notice and Proof of Claim were posted in downloadable form on a website specific to the Settlement, www.staarsurgicalsecuritieslitigation.com. *Id.* ¶¶ 8, 11. The deadline to object to any aspect of the Settlement and to request exclusion is September 25, 2017. To date, there have been no objections and no request for exclusion. *Id.* ¶¶ 13-14.

## II.    THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE

### A.    Standard

In deciding whether to approve a proposed settlement, the Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex

7

class action litigation is concerned." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Thus, in assessing the Settlement under Rule 23(e), the Court must only intrude upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit to the extent necessary to reach a reasoned judgment that (a) the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that (b) the settlement, taken as a whole, is fair, reasonable and adequate to all concerned. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).

There is no prescribed settlement approval procedure to be followed in this Circuit.  Rather, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because [the trial judge] is exposed to the litigants, and their strategies, positions and proof." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). To avoid excessive intrusion into the parties' compromise, the court considers the settlement taken as a whole, rather than its individual component parts, and examines it for overall fairness. *Officers for Justice v. Civil Serv. Comm'n.*, 688 F.2d 615, 628 (9th Cir. 1982). Consequently, a settlement hearing is "not to be turned into a trial or rehearsal for trial on the merits," nor should the proposed settlement "be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* at 625. Rather, "[t]he involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair." *Roberti v. OSI Sys., Inc.*, 2015 WL 8329916, at *3 (C.D. Cal. Dec. 8, 2015) (*quoting Linney v. Cellular Alaska P'ship*, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997)).

As explained below, the Settlement was reached after extensive investigation and litigation by experienced counsel on both sides, and then only after protracted arms-length negotiations. Under these circumstances, the Settlement has the presumption of fairness.

## B.   The Settlement Is The Result Of Arm's-Length Negotiations And A Mediator's Recommendation

The Parties' negotiations were thorough and the Settlement reached without collusion after good-faith bargaining among the Parties and Defendants' insurance carriers, including the acceptance of an informed double-blind Mediator's Recommendation. As detailed in the Mediator Declaration, Class Counsel, defense counsel, and the insurance carriers participated in a full-day mediation with Ms. Yoshida on January 24, 2017. Before the mediation, the Parties submitted to Ms. Yoshida detailed mediation statements and exhibits that addressed both liability and damage issues. The session ended without any agreement being reached.

Over the course of the next several months, Ms. Yoshida conducted further negotiations with the Parties and the carriers, which culminated in an agreement in principle to settle the Action following a Mediator's Recommendation. The Mediator's Recommendation was based on Ms. Yoshida's review and understanding of the mediation statements and filings in the Action, the mediation session, her separate conversations with each Party.

As courts within this Circuit and nationwide have found, "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is noncollusive." *Satchell v. Fed. Express Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007); *see Lundell v. Dell, Inc.*, 2006 WL 3507938, at *3 (N.D. Cal. Dec. 5, 2006) (approving class action settlement that was "the result of intensive, arms'-length negotiations between experienced attorneys familiar with the legal

and factual issues of this case"). The arm's-length nature of the negotiations supports final approval of the Settlement.

## C.   All of the Relevant Factors Employed by Courts in This Circuit Favor Approval of the Proposed Settlement As Fair, Reasonable and Adequate

To determine whether a proposed settlement is fair, reasonable, and adequate, a court must examine the following factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the amount offered in settlement; (4) the risk of maintaining class status through trial; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Linney*, 151 F.3d at 1242. These factors all support approval of the proposed Settlement.

### 1.   Lead Plaintiff's Case is Strong, But Entails Risks

While Lead Plaintiff and Class Counsel believe that they could ultimately prevail against Defendants, they recognize that numerous risks and uncertainties would accompany further litigation of the Class's claims. "[S]ecurities class actions are notably difficult and notoriously uncertain to litigate." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014) (internal quotations omitted); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *7 (C.D. Cal. June 10, 2005) ("[i]t is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."). Even for cases that survive a motion to dismiss, a positive result is far from guaranteed. Often, discovery will not provide clear trial evidence. Cases that reach summary judgment are often undercut by a ruling. For those cases that make it to trial (in whole or in part), it is always a challenge

and never a guarantee to succeed in establishing liability. For the reasons stated below, this case likely would have been no different.

The fraud alleged in this case centered around problems arising from STAAR's consolidation of its manufacturing into its Monrovia, California facility, and violations of FDA regulations that prevented FDA approval of STAAR's new product until those violations were remedied. The SAC alleges misrepresentations and omissions by Defendants during the Class Period concerning (i) the status of the Company's consolidation plan, (ii) the Company's compliance with FDA regulations, and (iii) the likelihood of the Company's new product to receive FDA approval. The SAC alleges that, in truth, the consolidation process was a mess, and the Company had several FDA regulatory violations identified during FDA inspections, which Defendants knew would delay FDA approval of STAAR's new product until they were remedied. The SAC alleges that investors were harmed when the market learned of Defendants' scheme through the FDA's publication of a Warning Letter on June 30, 2014, causing the share price of STAAR's common stock to fall. STAAR stock price declined further on August 1, 2014, following the filing of the Company's Q2 2014 Form 10-Q and earnings call, both of which discussed the Warning Letter and its implications for the Company.

In order to prevail on its claims, Lead Plaintiff would bear the burden of proving falsity, materiality, reliance, scienter, loss causation, and damages. Each of these issues would be vigorously contested. For example, Defendants argued in their motion to dismiss that the statements about the consolidation going "according to plan", FDA compliance and the likelihood of FDA approval of the Company's new product were not false and misleading when made and accompanied by appropriate cautionary statements. Even though the Court found in denying the motion to dismiss that Lead Plaintiff had adequately alleged the

falsity of Defendants' statements, Defendants undoubtedly would have continued to press those arguments at summary judgment and/or trial.

Scienter is regarded as the most difficult element to prove in a securities fraud claim. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001). Although Lead Plaintiff and Class counsel believe that the Defendants knowingly made false statements, satisfying Lead Plaintiff's burden of proof would, as in any case, be a challenge. *Vinh Nguyen v. Radient Pharm.*, 2014 WL 1802293, at *2 (C.D. Cal. May 6, 2014) ("any claim requiring proof of an intentional mental state presents challenges."); *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166, 1172 (S.D. Cal. 2007) ("The Court also recognized that the issues of scienter and causation are complex and difficult to establish at trial" and, as a result, "concludes that the settlement is a prudent course."). Defendants would undoubtedly challenge scienter by arguing and trying to prove that they were unaware of any significant FDA regulatory violations at the time that they made their statements of compliance and that to the extent that they were aware of any violations they honestly believed that (i) the violations were not significant, (ii) were only preliminary findings by the FDA that could be amended, and (iii) could be easily resolved to the FDA's satisfaction without any impact on the approval of the Company's new product. In particular, Defendants have argued, and would continue to argue, that they had no basis to question the Company's compliance, at the very least, at any time prior to their March 12, 2014 statement of compliance, which was over four months into the Class Period. The acceptance by the Court or the jury of these arguments could eliminate some or all of the alleged false statements, and similarly affect the recovery of the Class.

Plaintiffs would also have had to prove loss causation and damages – that the revelation of the fraud caused the price of STAAR's stock to fall. These

elements can only be proved through expensive, complex, and risky expert testimony. *See, e.g. In re Pfizer Inc. Sec. Litig.*, 2014 WL 3291230, at *3 (S.D.N.Y. July 8, 2014) (entering summary judgment in favor of defendants after excluding Plaintiffs' experts on damages pursuant to Daubert); *see also In re Am. Apparel, Inc. S'holder Litig.*, 2014 WL 10212865, at *9 (C.D. Cal. July 28, 2014) (noting that plaintiffs must turn to experts to disaggregate losses from nonactionable and actionable factors).

> In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.

*In re Warner Comm. Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985); *see also Aarons v. BMW of N. Am., LLC*, 2014 WL 4090564, at *10 (C.D. Cal. Apr. 29, 2014) ("battle of the experts" are "inherently risky").

Specifically, Defendants would likely argue that any decline in STAAR's stock price other than on July 1, 2014, the day immediately following the June 30, 2014 publication of the FDA Warning Letter, is not recoverable. Rather, Defendants would argue that because STAAR's stock traded in an efficient market that reacted to information quickly, the decline in STAAR stock price on July 2, 2014 is not recoverable because it is temporally too far removed from the alleged "corrective disclosure" on June 30, 2014.  Similarly, Defendants would argue that the decline in STAAR stock price on August 1, 2014, following the filing of STAAR's Q2 2014 Form 10-Q and earnings call is not recoverable because the information disclosed concerning the FDA Warning Letter was not sufficiently "new" to be the cause of the stock price decline. Defendants would likely further argue that even if any of the alleged corrective disclosures were found to have revealed the falsity of Defendants' statements, Plaintiff would not

13

be able to disaggregate the losses caused by those disclosures from losses caused by other non-actionable factors. If Defendants were successful in any of these arguments, it would significantly impact the amount of damages.  For example, if the jury determined that only the decline on July 1, 2014 was recoverable, estimated damages would drop to $15.6 million. Wernke Decl. ¶¶ 75, 117.

Had any of these arguments been accepted in whole or part, they could have eliminated or, at a minimum, dramatically limited any potential recovery for the Settlement Class. Further, Lead Plaintiff would have had to prevail at several stages –summary judgment, trial – and if it prevailed on those on the appeals that were likely to follow. The Settlement avoids these litigation risks and guarantees the Settlement Class a favorable and immediate cash recovery of $7 million.

### 2.    The Expense, Complexity, And Likely Duration Of Further Litigation

Courts consistently recognize that the expense, complexity, and possible duration of the litigation are key factors in evaluating the reasonableness of a settlement. *See, e.g., Torrisi v. Tucson Elec. Power Co.,*8 F.3d 1370, 1375-76 (9th Cir. 1993). Thus, a court "shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expense litigation." *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).

It is well known that class action litigation is inherently complex. *See, e.g., Nobles v. MBNA Corp.*, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009) (finding a proposed settlement proper "given the inherent difficulty of prevailing in class action litigation"). Securities class actions, in particular, are typically complex and expensive to prosecute. *See, e.g., Heritage*, 2005 WL 1594403, at *6. This Action is no exception. If taken to trial, this Action would have expended substantial party and judicial resources. The  Action  would  have  required

14

additional extensive deposition and expert discovery, requiring much additional time by the Parties (and likely the Court to resolve disputes), and at great additional expense. Substantial time and expense would also be expended in further motion practice, including at the summary judgment stage, and preparing the case for trial. The trial itself would be time-consuming, expensive, and uncertain – and no matter the outcome, appeals would be likely. Even if Lead Plaintiff prevailed through motion practice, and ultimately won at trial and on appeal, the appeals process could span several years, during which the Class would receive nothing.

In contrast, the Settlement results in an immediate and substantial tangible recovery for the Class, without the risk, expense, and delay of further litigation. *See Vasquez v. Coast Valley Roofing, Inc*., 266 F.R.D. 482, 489 (E.D. Cal. 2010) ("It has been held proper to take the bird in hand instead of a prospective flock in the bush.") (internal citations omitted). This factor likewise favors approval.

### 3. The Risk Of Maintaining Class Action Status Throughout The Trial

While Lead Plaintiff successfully obtained class certification, there was no guarantee that status would remain throughout the trial, as the Court may exercise its discretion to re-evaluate the appropriateness of class certification at any time. Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *see also In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("[T]here is no guarantee the certification would survive through trial, as Defendants might have sought decertification or modification of the class."). The Settlement avoids the uncertainty with respect to the maintaining certification and, thus, supports approval of the Settlement. *See id.* at 1041-42.

15

### 4.    The Amount Offered in the Settlement

The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum. Nor is the proposed settlement "to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625. As "[s]ettlement is the offspring of compromise[] the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. In fact, a settlement may be acceptable even if it amounts to only a fraction of the potential recovery that might be available at trial. *See Mego Fin.*, 213 F.3d at 459.

Here, the Settlement provides for the recovery of $7 million in cash. The Settlement was the direct consequence of Ms. Yoshida's informed Mediator's Recommendation, and was reached only after Class Counsel had conducted an extensive investigation, consulted with experts, overcame Defendants' motion to dismiss, obtained class certification, pursued discovery, and engaged in substantial negotiations. The recovery provides an immediate and tangible benefit to the Class, and is well within a range of reasonableness in light of the best possible recovery and the substantial risks presented by the litigation.

Class Counsel engaged a consultant to estimate the potentially recoverable damages.  Estimating aggregate damages can be challenging due to, among other things, assumptions that must be made regarding trading activity. A popular model used to estimate damages is referred to as the "Two-Trader Model" (also called the "80/20 Model").  The Two-Trader model is the model often used by Cornerstone Research, a damages firm routinely hired by Defendants in securities actions. Here, such an estimate of potential maximum recoverable damages, assuming Lead Plaintiff wholly prevailed and overcame all defenses was at most approximately $36 million. But that number would be reduced or eliminated

entirely if the Court or jury accepted some or all of Defendants' defenses, including their claim their claim that the majority of the losses are attributable to causes other than the alleged misstatements or omissions, or that certain statements are not actionable.  If, for example, Lead Plaintiff failed to prove that Defendants were aware of any significant FDA violations that could delay FDA approval until March 12, 2014, damages could be reduced to $26 million.  If Lead Plaintiff was only able to prove that the July 1, 2014 stock price decline was recoverable under loss causation (the day immediately following the June 30, 2014 disclosure of the FDA Warning Letter), damages could be reduced to $15.6 million. If the jury found in Defendants' favor on both of these issues, damages could be reduced to $10.4 million.

Even before accounting for Defendants' arguments, the Settlement of $7 million constitutes a recovery of almost 20% of the maximum recoverable damages, which is significantly higher than the 7.3% median settlement recovery as a percentage of estimated damages in securities class actions in 2016 where estimated damages were less than $50 million. *See* Cornerstone Research, "Securities Class Action Settlements: 2016 Review and Analysis," at p. 8, Figure 7, *available at* https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Filings-2016-YIR.  If the Class could only recover for the July 1, 2014 stock price decline, the $7 million Settlement would constitute a recovery of 45% of the estimated damages. Thus, the result achieved by Class Counsel is excellent.  *See, Omnivision*, 559 F. Supp. 2d at 1042 ($13.75 million settlement yielding 6% of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 240 (3d. Cir. 2001) (typical recoveries in securities class actions range from 1.6% to 14% of total losses).

17

### 5.   Extent Of Discovery Completed And The Stage of the Proceedings

The stage of the proceedings and the amount of information available to the parties to assess the strengths and weaknesses of their case are additional factors that courts consider in determining the fairness, reasonableness, and adequacy of a settlement. *See Mego Fin.*, 213 F.3d at 459; *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009).

Here, Settlement was achieved only after Defendants had completed their production of over 350,000 pages of documents, and only a week before the first scheduled deposition of STAAR's current and former employees. Before entering into the Settlement, Class Counsel reviewed all the documents produced and thoroughly evaluated the strengths and weaknesses of Lead Plaintiff's claims. As set forth in greater detail in the Wernke Declaration, Class Counsel extensively developed the record by, among other things: (a) thoroughly reviewed and analyzed thousands of pages of publicly available information and documents regarding STAAR including, but not limited to, its United States Securities and Exchange Commission ("SEC") filings, financial statements, press releases, conference call transcripts, analysts' reports, and media coverage; (b) identified numerous potential witnesses and conducted detailed investigative interviews of witnesses; (c) drafted and filed a comprehensive consolidated complaint that would satisfy the heightened pleading standards of the PSLRA, which was amended as additional information concerning the alleged fraud was discovered; (d) conducted extensive research of the applicable law for claims in this Action and the potential defenses thereto; (e) successfully opposed Defendants' motions to dismiss and disqualify Plaintiff's Counsel; (f) successfully moved for class certification; (g) reviewed approximately 60,000 pages of documents produced in discovery; (h) preparing for depositions; (i) working with consultants regarding, among other things, FDA regulations, industry-specific compliance practices,

loss causation, and damages; (j) appearing at court conferences; and (k) researching, preparing and drafting comprehensive briefs for mediation and reviewing and analyzing Defendants' mediation brief. Wernke Decl. ¶¶ 7, 103.

Plaintiff and Plaintiff's Counsel were in an excellent position to evaluate the strengths of their allegations against Defendants as well as the Mediator's Recommendation to settle the Action for $7 million before additional time and resources were expended on further litigation. Courts in this Circuit have recognized that, "[t]hrough protracted litigation, the settlement class could conceivably extract more, but at a plausible risk of getting nothing." *In re Critical Path, Inc. Sec. Litig.*, 2002 WL 32627559, at *7 (N.D. Cal. June 18, 2002). For this reason, courts have commended class counsel for recognizing when, as in this case, a prompt resolution of the matter is in the best interest of the class. *See Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *15 (N.D. Cal. Jan. 26, 2007) ("Class counsel achieved an excellent result for the class members by settling the instant action promptly."), *aff'd*, 331 Fed. Appx. 452, 457 (9th Cir. 2009).

Indeed, courts regularly approve settlements reached much earlier in the formal litigation process. *See, e.g., Mego Fin.*, 213 F.3d at 459 (finding that even absent extensive formal discovery, class counsel's significant investigation and research supported settlement approval); *Roberti*, 2015 WL 8329916, at *5 (approving settlement shortly after surviving motion to dismiss and prior to significant discovery). In sum, the parties reached a settlement when they were well informed as to the facts, legal issues, and risks of the Action.

### 6. Experienced Counsel Concur that the Settlement, Which was Negotiated in Good Faith and at Arm's-Length, is Fair, Reasonable, and Adequate

"[T]he fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight." *Ellis*

1   *v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd,* 661 F.2d

2   939 (9th Cir. 1981); accord *Boyd v. Bank of Am. Corp.*, 2014 WL 6473804, at *6

3   (C.D. Cal. Nov. 18, 2014). And "a presumption of correctness is said to attach to a

4   class settlement reached in arms-length negotiations between experienced capable

5   counsel after meaningful discovery." *Heritage*, 2005 WL 1594403, at *9 (citing

6   *Manual for Complex Litigation* (Third) § 30.42 (1995) (internal quotations

7   omitted). This case has been litigated by experienced and well-respected counsel

8   on both sides. Defendants' counsel, Morrison & Foerster LLP ("MoFo") is a

9   highly-respected law firm that is widely recognized as having one of the nation's

10   leading securities litigation practices. Wernke Decl. ¶ 114. Plaintiff's Counsel has

11   substantial securities litigation experience, having prosecuted and resolved dozens

12   of complex securities cases, including some of the largest cash recoveries in

13   securities class action history. *See, e.g. In re Comverse Tech., Inc. Sec. Litig.*, 06-

14   cv-1825 (E.D.N.Y. June 24, 2010) ($225 million settlement). *See also* Firm

15   Resume of Pomerantz and GP&M, attached to Wernke Decl. as Exhibits 5-A, 5-B.

16   Plaintiff's Counsel are intimately familiar with the strengths and weaknesses of

17   the case and the core facts, and wholeheartedly recommend this Settlement as fair,

18   reasonable, and adequate.

19       Further, the Settlement was overseen by a highly respected mediator;

20   Michelle Yoshida, Esq. of Phillips ADR, one of the nation's preeminent

21   mediation firms. The Parties engaged in hard-fought negotiations over the course

22   of a full-day in-person mediation session, and held further discussions through

23   Ms. Yoshida telephonically. The negotiations were in good faith and at arm's-

24   length. Though professional, the discussions were zealous, and even heated; there

25   was no collusion. Indeed, the Parties were at an impasse prior to Ms. Yoshida

26   proposing a Mediator's Recommendation, which resulted in the Settlement.

27   Wernke Decl. ¶ 66. As a result of these long and hard-fought negotiations the

28

parties agreed to the settle this Action for $7 million. Only after these protracted and good faith negotiations did the parties finally agree to all the terms of the settlement reflected in the Stipulation. *Id.* Ms. Yoshida explains: "it was apparent to me that both sides possessed strong, non-frivolous arguments supporting their positions." *See* Declaration of Michelle Yoshida ("Yoshida Decl." or "Mediator Decl."), attached as Exhibit 4 to the Wernke Decl.

> I believe that the $7 Million settlement represents a well-reasoned and sound resolution of highly uncertain litigation and that the result is fair, adequate, reasonable and in the best interest of the Class … I can say that I strongly support and respectfully recommend the final approval of the Settlement in all respects.

*Id.* ¶ 11.

Class Counsel recommends that the Court approve the Settlement because it is fair, reasonable, and adequate, and in the best interests of the Settlement Class. Wernke Decl. ¶ 60.

### 7.    The Reaction of the Class Members to the Settlement

The reaction of the Settlement Class to the Settlement is another factor in determining the adequacy of the Settlement. *See Rambus*, 2009 WL 166689, at *3 (citation omitted). Pursuant to the Court's Preliminary Approval Order, 8,759 Short-Form Notices were sent to Class Members to date and Summary Notice was transmitted over the *Globe Newswire* and published in *Investors' Business Daily* on July 24, 2017. GCG Decl. ¶¶ 7, 10. The deadline to object to, or exclude oneself from the settlement is September 25, 2017. *Id.* ¶¶ 13-14. To date, no objections have been received to the Settlement, Plan of Allocation, or any other aspect of the Settlement, and there has been no request for exclusion from the Settlement. *Id.* "[T]he fact that the overwhelming majority of the class willingly

approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness" *Hanlon,* 150 F.3d at 1027.

### D.   The Notice Program Satisfied Due Process And Complied With Fed. R. Civ. P. 23(e)

Due process requires that the class members be given notice of a proposed settlement and their right to be heard at the fairness hearing. There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements. Rather, to satisfy due process and comply with Fed. R. Civ. P. 23(e), notice for the approval of a class settlement by class members must only fairly apprise them of the subject matter of the suit, the proposed terms of the settlement, and the members' opportunity to be heard. *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1177 (9th Cir. 1977); *see also Torrisi*, 8 F.3d at 1374-75. Notice is "adequate if it may be understood by the average class member." 4 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 11.53 at 167.

### 1.   The Dissemination Plan Satisfies Due Process

There is no statutory or due process requirement that all class members receive actual notice by mail or other means. Rather, "individual notices must be provided to those Class Members who are identifiable through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175-76 (1974). "Rule 23(e) gives the Court 'virtually complete' discretion as to the manner of service of settlement notice." *Colesberry v. Ruiz Food Products, Inc.*, 2006 WL 1875444, at *7 (E.D. Cal. June 30, 2006) (citing *Franks v. Kroger Co.*, 649 F.2d 1216, 1222-23 (6th Cir. 1981)).   Here the notice was disseminated via individual mailing of over 8,759 printed notices and published over a national business internet newswire. This notice satisfies the due process requirement.

## 2.    The Contents of the Notice Satisfy Due Process

The Ninth Circuit provides that proper notice should provide: (1) the material terms of the proposed settlement; (2) disclosure of any special benefit to the class representatives; (3) disclosure of the attorneys' fees provisions; (4) the time and place of the final approval hearing and the method for objecting to the settlement; (5) and explanation regarding the procedures for allocating and distributing the settlement funds; and (6) the address and phone number of class counsel and the procedures for making inquiries. *See Marshall*, 550 F.2d at 1178.

Here, the Court-approved Short-Form Notice provided all of the required information, either directly or by directing recipients to the greater detail included in the Long-Form Notice: a description of the $7 million Gross Settlement Fund; Plaintiff's Counsel's intent to apply for a fee award in an amount not to exceed 25% of the Gross Settlement Fund for settlement of the class claims and an amount not to exceed $350,000 for reimbursement of expenses; the request for an award to Lead Plaintiff in an amount not to exceed $10,000; and the contact information for Plaintiff's Counsel and the Claims Administrator, including how to make inquiries to both. GCG Decl. Ex. A, B. Both the Short-Form Notice and Long-Form Notice also included the date, time, and place of the fairness hearing, described how to object, and informed Class Members that any objection must be postmarked or received by the Court no later than September 25, 2017, and any proof of claim form must be postmarked no later than October 16, 2017. *Id*. The Short-Form Notice also identified the Settlement website where the Long-Form Notice and Proof of Claim could be downloaded. *Id.* The Court-approved Long-Form Notice provided additional detail, the Plan of Allocation of the Net Settlement Fund, and adequately informed class members of the impact of the Settlement, including release of claims against the Released Persons for any Settlement Class Members who do not opt out. GCG Decl. Ex. B.

23

In sum, broad dissemination of the Court-approved Short-Form Notice and Summary Notice satisfied every conceivable requirement of due process. Accordingly, the Settlement should be granted final approval.

## III.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

"Approval of a settlement, including a plan of allocation, rests in the sound discretion of the court." *Heritage*, 2005 WL 1594403, at *11. Assessment of the adequacy of a plan of allocation in a class action is governed by the same standards of review applicable to the settlement as a whole – the plan needs to be "fair, reasonable and adequate." *See Omnivision*, 559 F. Supp. 2d at 1045; *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992). "When formulated by competent and experienced class counsel, an allocation plan need have only a 'reasonable, rational' basis." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004). Because they tend to mirror the complaint's allegations in securities class actions, "plans that allocate money depending on the timing of purchases and sales of the securities at issue are common." *In re Datatec Sys., Inc. Sec. Litig.*, 2007 WL 4225828, at *5 (D.N.J. Nov. 28, 2007); *see also In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (deeming plan of allocation where "claimants are to be reimbursed on a *pro rata* basis for their recognized losses based largely on when they bought and sold their shares of General Instrument stock" as "even handed").

Here, the proposed Plan of Allocation herein was fully described in the Long-Form Notice provided to the Class, at pages 4-7. GCG Decl., Ex. B. It was formulated by Class Counsel, in consultation with an independent damages expert, with the goal of reimbursing Class Members in a fair and reasonable manner. Nye Decl. ¶ 11.   The proposed Plan of Allocation distributes the settlement proceeds on a *pro rata* basis, calculating a Claimant's relative loss

proximately caused by Defendants' alleged false and misleading statements and material omissions, based on factors such as when and at what prices the Claimant purchased and sold STAAR common stock. *Id*. ¶¶ 4-10.

In developing the Plan of Allocation, Lead Plaintiff's expert calculated the amount of estimated artificial inflation in the per share closing price of STAAR common stock that allegedly was proximately caused by Defendants' alleged false and misleading statements and material omissions. *Id.* In so doing, Lead Plaintiff's expert considered the fraud-related price declines in STAAR's common stock price following the two alleged corrective disclosures that, according to Lead Plaintiff's allegations, revealed (at least partially) the alleged truth to investors. *Id.* ¶ 6. Lead Plaintiff's expert performed an event study, a widely accepted methodology used to isolate the company-specific portion of a price decline after controlling for market and industry factors, and to determine whether a decline is statistically significant. *Id.*

In response to over 8,759 Short-Form Notices sent, there have been no objections and no exclusion requests from a potential Class Member, further supporting its approval. In short, the Plan of Allocation has a rational basis and fairly compensates Settlement Class Members, and this Court should approve it.

## IV.   CONCLUSION

Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and the proposed Plan of Allocation.

Dated: September 11, 2017

Respectfully Submitted,


**POMERANTZ LLP**

/s/ *Michael J. Wernke*_____
Marc I. Gross
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: migross@pomlaw.com
         jalieberman@pomlaw.com
         mjwernke@pomlaw.com

*Lead Counsel for Lead Plaintiff
and for the Class*


**GLANCY   PRONGAY   &   MURRAY LLP**
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Kevin Ruf (#136901)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

*Liaison Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I, Michael J. Wernke, hereby declare under penalty of perjury as follows:

I am an attorney at Pomerantz LLP located at 600 Third Avenue, 20th Floor, New York, New York 10016. I am over the age of eighteen.

On September 11, 2017, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system: **NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I certify under penalty of perjury under the laws of the United States of America that the foregoing in true and correct.

Executed on September 11, 2017.

*/s/ Michael J. Wernke*